## IN THE UNITED STATES DISTRICT COURT
## <u>FOR THE DISTRICT OF MARYLAND</u>

| | | |
|---|---|---|
| **JAMES HANDLEY,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: DLB-20-1054** |
| **BALTIMORE POLICE DEPARTMENT,** | * | |
| **Defendant.** | * | |

## <u>MEMORANDUM OPINION</u>

James Handley filed suit against his former employer, the Baltimore Police Department ("BPD"), claiming disparate treatment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.  ECF 1.  In his amended complaint, Handley alleges BPD and its agents demoted him and denied him promotion based on his race and sex (Count I); opened a fabricated Internal Affairs investigation into his conduct based on his race (Count II); reassigned him to a less desirable work location based on his race (Count III); retaliated against him for filing a charge of discrimination by berating him at a meeting and removing him from a BPD command-level group text chat (Count IV); and retaliated against him for filing this action by ordering him to provide a statement regarding his alleged use of a racial slur and intimidating and threatening him to accept a finding that the allegations had been "sustained" despite there being no pending charges and no investigation into the allegations (Count V).  ECF 12.  BPD moves to dismiss all counts.  ECF 25.  The motion is fully briefed.  ECF 28 & 29.  For the following reasons, BPD's motion to dismiss is granted in part and denied in part.  Counts II, III, IV, V, and part of Count I are dismissed.

## I.     Background

Handley has been a decorated member of the BPD since 1998.  ECF 12, ¶ 17.  He has received several promotions during his employment, attaining the rank of Major in 2012.  *Id.* Handley is a Caucasian male.  *Id.*

In January 2016, Handley was assigned to BPD's Recruitment Unit.  *Id.*  In 2017, the Mayor of Baltimore praised the success of the Recruitment Unit under Handley, remarking publicly that BPD had hired more sworn officers than it lost to attrition for the first time since 2009.  *Id.* ¶ 18.  Under Handley's leadership, hiring increased by 127 percent, from 91 to more than 200.  *Id.*  Also during Handley's tenure, an applicant named Daniel De Sousa applied to become a BPD police officer but was disqualified from the hiring process due to "a lack of integrity and an automatic [Code of Maryland Regulations] Disqualifier."  *Id.* ¶ 19.

On January 16, 2018, BPD Police Commissioner Kevin Davis promoted Handley to Acting Inspector of the Recruitment and Professional Development Division.  *Id.* ¶ 20.  Davis also promoted several other men and one woman of different races to "acting" positions.  *Id.*  At a roundtable meeting preceding the promotions, Daryl De Sousa ("De Sousa"), a member of the Senior Command Staff and father of Daniel De Sousa, strongly objected to Handley's promotion "because [Handley] denied his son's application to the BPD." *Id.* ¶ 21.  Ten months earlier, before his son's application had been denied, De Sousa referred to Handley as an "all-star" with regard to his recruitment effort of a specific unidentified applicant.  *Id.* ¶ 43.

Around 7:50 a.m. on January 19, just three days after Davis promoted Handley, Handley's office computer became non-operable.  *Id.* ¶ 22.  While attempting to contact the Information Technology Section to resolve the problem, Handley learned Davis had been fired and De Sousa had been named Acting Police Commissioner.  *Id.*  At 8:10 a.m., another officer entered Handley's

office and informed him she had been ordered to seize his computer and not tell him who gave the order or who else was having their computers seized. *Id.* ¶ 23. At 8:47 a.m., Handley noticed his departmental cellphone stopped working. *Id.* ¶ 24. At 9:25 a.m., while meeting with other officers, he noticed his BPD access badge was deactivated and learned that several other computers belonging to Caucasian male officers had been seized that morning. *Id.* ¶ 25.

Handley's cellphone service was restored, without explanation, at 11:49 a.m. *Id.* ¶ 26. The officer who had seized his computer returned it at 12:15 p.m. and stated it "was taken because it was going to be replaced with a new computer. No new computer could be located so your computer is being returned." *Id.* Around this time, Handley began hearing rumors his demotion was imminent. *Id.*

Following De Sousa's appointment, the media reported on "rampant 'confusion' concerning BPD's seizure of computers, deactivation of access to BPD buildings and cell service disconnections." *Id.* ¶ 27. The mayor's office denied that the actions signaled a "purge" of officers placed in leadership roles by former Commissioner Davis and instead blamed the incidents on technical issues. *Id.* De Sousa later stated to the media that he ordered at least one commander's access to files and communication systems cut off "in hopes of preventing leaks of sensitive information." *Id.* ¶ 28. He declined to name the commander(s) he had targeted, citing "an ongoing internal investigation." *Id.* ¶ 29. He stated he planned to announce a restructuring of the Department and new command appointments the following week. *Id.*

On February 2, 2018, Handley reported to De Sousa's office. *Id.* ¶ 31. During a brief meeting, De Sousa told Handley he was "abolishing the Inspector's rank[,]" that Handley would return to the rank of Major, and that Handley would transfer to the Southwest District as the District Commander to mentor the District's Captain. *Id.* ¶ 32. Handley alleges the stated reason for his

demotion, which he sometimes describes as a refusal to honor his promotion, *id.* ¶ 35, was pretext for discrimination and retaliation, *id.* ¶ 33. De Sousa did not abolish the Inspector rank, changing titles rather than BPD's organizational structure; Inspector became Lieutenant Colonel. *Id.* ¶ 33. After changing the titles, De Sousa allegedly made command-level employment decisions based on race. *Id.* ¶ 34. For example, he demoted three Caucasian officers and promoted seven African American officers. *Id.* As a result of De Sousa's refusal to honor Handley's promotion, Handley did not receive a salary increase. *Id.* ¶ 35.

On February 6, the officer who oversaw the recruiting and hiring of sworn BPD members requested Handley provide her with Daniel De Sousa's entire hiring folder. *Id.* ¶ 36. That afternoon, Handley was told to report to the Internal Affairs Division and to bring a specific officer's personnel folder. *Id.* ¶ 37. Handley refers to this officer as "Officer Doe." *Id.* Handley learned an unidentified source had alleged Officer Doe had been hired despite a prior arrest for a narcotics violation. *Id.* At the Internal Affairs Division, Handley met with Major Ian Dombroski and Chief Rodney Hill to discuss Officer Doe's hiring, and he learned the unidentified source was De Sousa. *Id.* ¶ 38. Hill and Dombroski stated the interview was neither disciplinary nor part of an ongoing investigation against Handley, so Handley spoke freely. *Id.* Handley informed them that the difference between Officer Doe's application and Daniel De Sousa's application was that Officer Doe "had been completely honest throughout the entire hiring process, unlike Daniel De Sousa." *Id.* After reviewing Officer Doe's application, Hill and Dombroski agreed that there were no issues. *Id.* Before De Sousa succeeded Davis, Davis and/or his Chief of Staff would work with Handley directly to resolve hiring-related issues. *Id.* ¶ 39. Ordering the Internal Affairs Division to investigate Handley's hiring decisions was "unprecedented." *Id.* After the meeting, Dombroski

informed Handley that De Sousa, before ordering Handley's interview, had spoken to Hill about Daniel De Sousa's disqualification from the BPD hiring process.  *Id.* ¶ 40.

On February 8, Handley's transfer to the Southwest District was announced.  *Id.* ¶ 41.  That same day, De Sousa announced Lieutenant Colonel Margaret Barillaro, a Caucasian woman, would replace Handley as head of the Training and Personnel Divisions.  *Id.*  Barillaro was previously assigned to the Southern District while she was a major, and during that time she allowed certain "Special Police Officers," who are generally authorized to arrest individuals who trespass or commit offenses on the property within the officers' commission, certain privileges outside the jurisdiction of their commission.  *Id.* ¶ 42.  For example, she allowed them to wear clothing that identified them as police, possess BPD radios, attend BPD roll call, park vehicles at BPD stations, utilize flashing vehicle lights, and participate in police chases, arrests, and searches.  *Id.*  Barillaro "was forced to terminate this relationship" after attending a community meeting where members of the public asked about the status of the Special Police Officers.  *Id.* ¶ 42.  For this reason, and because of Handley's own record of success, Handley asserts Barillaro was less qualified than he was.  *Id.* ¶¶ 41–42.

On February 11, Hill contacted Handley and reported that Deputy Commissioner Bonaparte had inquired about the hiring of Officer Doe.  *Id.* ¶ 44.  Hill informed Bonaparte about the previous meeting and his conclusion that no further action was necessary.  *Id.*  Bonaparte ordered Hill to provide a report regarding the meeting by February 12, including a taped statement or administrative report from Handley.  *Id.*  Hill then ordered Handley to prepare an administrative report.  *Id.*  Handley told Hill he felt De Sousa and Bonaparte were subjecting him to a hostile work environment and retaliating against him for not hiring Daniel De Sousa.  *Id.*  Handley prepared an administrative report and provided it to Hill the next day, and Hill stated he would

recommend the charges be "Not Sustained." *Id.* ¶ 45.  De Sousa did not sign off on Hill's recommendation, and the charges against Handley lingered for over two years until April 10, 2020, when they were closed as "Unfounded." *Id.*  Handley's reputation and standing suffered as a result of the lingering charges. *Id.* ¶ 46.

On February 26, De Sousa led a retreat for BPD command members. *Id.* ¶ 47.  During the retreat, he remarked that BPD "suffers from PMS—Pale, Male, Stale" and stated his goal was to remove the "PMS elements" from the Department. *Id.*  Handley views this comment as direct evidence of De Sousa's motive to disadvantage Caucasian men in favor of African Americans and women in BPD command staff. *Id.*  Compared to Davis' tenure as Commissioner, the organizational charts under De Sousa reflect a substantial shift from Caucasian to African American in the demographic makeup of BPD's command positions. *Id.*

On March 12, 2018, De Sousa met with Handley. *Id.* ¶ 48.  De Sousa said he was removing Handley from his current command position at the Southwest District because Handley was "not community oriented." *Id.* ¶ 49.  Handley objected, listing examples of community-related events he had attended or was scheduled to attend and noting that in the Southwest District homicides, non-fatal shootings, and robberies were down compared to the same period in 2017. *Id.*  Handley had been stationed in the Southwest District for less than one month. *Id.* ¶ 51.  De Sousa was not receptive to Handley's arguments, and he informed Handley that he was being transferred to the Medical Section and that another officer would replace him at the Southwest District. *Id.* ¶ 50.  Handley's replacement was an African American male who had recently been promoted to the rank of Captain and had less than two months' experience as a member of the command staff. *Id.*

On June 28, 2018, Handley filed a charge of discrimination with the Equal Employment Opportunity Commission.  ECF 25-2.  He claimed race and sex discrimination based on his

temporary loss of various access privileges in January 2018, his demotion from Acting Inspector rank and reassignment in February 2018, the opening of the internal investigation in February 2018, and his reassignment in March 2018.  *Id.*

On September 19, 2018, Barillaro—the officer in Handley's former position in Recruitment—requested Handley meet with her to discuss the vendor BPD used for pre-hire psychological screening and other psychological services.  ECF 12, ¶ 53.  Handley said he could not meet at the stated time due to a prior commitment, but Barillaro insisted.  *Id.*  At the meeting, they discussed a specific officer's case, and Barillaro became frustrated at an error.  *Id.* ¶ 54.  Handley explained the reason for the error, which he ascribed to the officer's Sergeant.  *Id.*  Barillaro suddenly became angry and raised her voice.  *Id.*  She accused Handley of being "pissed off" because of his "so-called demotion" and stated he had a "chip on his shoulder[.]"  *Id.*  She stated he "was never really promoted" and that many commanders in acting positions had not had their promotions made permanent, and she told Handley to "get over it" because "it was sad that [he] had become this way."  *Id.*  The next day, Handley notified his supervisor of Barillaro's actions, which he regards as "blatant examples of retaliation" for his decision to file a charge of discrimination.  *Id.* ¶¶ 55–56.

On October 4, 2018, Handley learned from another command officer that Colonel Deron Garrity had removed Handley from the BPD command staff GroupMe texting group.  *Id.* ¶ 57.  GroupMe is a group texting application used by BPD command staff to share information about violent crime and other notable incidents.  *Id.*  Garrity had removed Handley from the texting group along with three others: an officer who had resigned that same day following an unidentified incident, an officer who was suspended and had an active Internal Affairs Investigation pending regarding his conduct, and an officer on medical leave who also may have had pending disciplinary

issues. *Id.* ¶ 58.  Handley's removal was visible to other members of the command staff, and he viewed it as humiliating and demeaning because it suggested he was not in good standing with the BPD. *Id.* ¶ 59.  De Sousa had promoted Garrity to Lieutenant Colonel, and an Interim Police Commissioner hand-picked by De Sousa had promoted Garrity to Colonel. *Id.*

On August 2, 2019, Baltimore City School Police Officer Martez Carter called Handley on Handley's departmental cellphone and asked about his standing in the BPD hiring process. *Id.* ¶ 60.  Two other officers were present during the phone conversation. *Id.*  At the end of the conversation, Carter agreed that Handley had been professional and courteous to him. *Id.* Sometime after the call, however, Carter contacted the BPD Public Integrity Bureau and alleged Handley used a racial slur towards him during the conversation. *Id.*  Carter's allegation was reported on the local television news on August 12, and the report stated BPD had an investigation underway. *Id.*  Between August 2, 2019 and February 24, 2020, BPD took no action to interview Handley about Carter's allegation. *Id.* ¶ 62.

On February 24, 2020, Handley notified the BPD Human Resources Section that he planned to retire effective May 1, with his last day of "in pay status" on April 30. *Id.* ¶ 61.  On March 26, an officer with the Public Integrity Bureau informed Handley he had no open or unresolved issues that would prevent him from retiring in good standing, and Handley received documentation stating the same. *Id.* ¶ 63.

On April 24, approximately one week before his retirement, Handley filed this lawsuit. *Id.* ¶ 64.  His initial complaint was predicated on his June 2018 charge of discrimination. ECF 1. BPD's legal counsel received a copy of the complaint for service. ECF 12, ¶ 64.  Later that day, a reporter from the *Baltimore Sun* contacted Handley's counsel about his complaint. *Id.* ¶ 65.  The *Baltimore Sun* published an article on the complaint on April 27. *Id.* ¶ 66.

On April 30, Handley's last day of employment with the BPD, he was compelled to provide a recorded statement to the Public Integrity Bureau regarding Carter's allegations against him. *Id.* ¶ 67. After Handley provided a statement to two detectives, one of them told him that he was required to accept a "sustained charge and punishment." *Id.* The detective was not able to provide details about the nature of the alleged charge, the investigation performed, or the proposed punishment. *Id.* Handley declined to accept a sustained charge or punishment, and he was told to call Deputy Police Commissioner Brian Nadeau of the Public Integrity Bureau. *Id.* Handley called Nadeau, who told him the charges were being sustained and advised him to sign a document admitting guilt and accepting an unspecified punishment. *Id.* ¶ 68. Nadeau was unable to provide written details about the substance of the alleged charge, the investigation, or the proposed punishment. *Id.* During the call, Nadeau stated he was not aware Handley was retiring that week. *Id.* Nadeau nonetheless said resolving the issue was in Handley's best interest and threatened that Handley could not retire in good standing if the complaint remained unresolved. *Id.* After Handley stated the Public Integrity Bureau had already provided him with written notification that he had no unresolved matters that would prohibit him from retiring in good standing, Nadeau seemed surprised and demanded to know who had provided that notification. *Id.*

After talking to Nadeau, Handley sent him an email memorializing their discussion. *Id.* ¶ 69. The email stated Handley refused to sign "any document regarding a guilty plea or punishment" related to Carter's allegations, that he did nothing wrong to justify the charge, and that he had not been provided any written details about the charge or a potential punishment. *Id.* Nadeau replied that he would review the final case and make a determination after it was written and "submitted to Command." *Id.* ¶ 70. Nadeau reported that Handley's good standing letter had been signed because his case was "not a termination case." *Id.* Nadeau stated Handley was "good

with that letter[,]" and he wished him the best in his retirement and thanked him for his commitment to BPD. *Id.* Handley interprets Nadeau's reply as confirming no written complaint had been submitted through the proper channels, no investigation by the Public Integrity Bureau took place, Handley's guilt was already decided, and the department had decided to punish him even though it had not finalized the nature of that punishment. *Id.* ¶ 71.

On June 11, 2020, Handley filed a second charge of discrimination, and the parties agreed the next day to stay this case while Handley pursued his new allegations. ECF 6. In his second charge, Handley claimed retaliation based on his interactions with Nadeau and the Public Integrity Bureau after he filed his complaint in April 2020. ECF 25-3. After the conclusion of the EEOC's investigation of the second charge, the stay was lifted, and Handley filed an amended complaint on May 28, 2021. ECF 12. BPD now moves to dismiss the amended complaint. ECF 25.

## II.    Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus*

*Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, --- F.4th ----, 2022 WL 3364824, at *3, *13 (4th Cir. Aug. 16, 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)).

On a Rule 12(b)(6) motion, the Court does not "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

## III. Discussion

Handley claims disparate treatment and retaliation under Title VII. "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prohibits employment discrimination." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). The Act reaches "status-based discrimination" by providing "basic workplace protection such as prohibitions against employer discrimination on the basis of race, color, religion, sex, or national origin, in hiring, firing, salary structure, promotion and the like." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013) (citing 42 U.S.C. § 2000e-2(a)). The statute also contains anti-retaliation protections that proscribe discrimination

against an employee because he "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

### A. Disparate Treatment

Handley asserts a disparate treatment claim based on his race and sex. To survive a motion to dismiss a Title VII employment discrimination claim, a plaintiff must "allege facts to satisfy the elements of a cause of action created by that statute." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2014)), *cert. denied*, 141 S. Ct. 1376 (2021). The plaintiff in a Title VII disparate treatment case ultimately bears the burden of proving the defendant discriminated against him "because of a protected characteristic." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998) (citing *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 243 (4th Cir. 1982)). This requires "supporting evidence through one of two methods: (1) 'direct or circumstantial evidence' that discrimination motivated the employer's adverse employment decision, or (2) the *McDonnell Douglas* 'pretext framework' that requires the plaintiff to show that the employer's stated permissible reason for taking an adverse employment action 'is actually pretext for discrimination.'" *Bing*, 959 F.3d at 616 n.8 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc)). A *prima facie* case of disparate treatment under the *McDonnell Douglas* framework involves four elements: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class" or other circumstances that raise an inference of unlawful discrimination. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 544–45 (4th Cir. 2003). While a plaintiff "need not plead a prima facie case of discrimination" to

survive a motion to dismiss, the elements of a *prima facie* case inform whether a plaintiff plausibly alleges a Title VII violation. *Bing*, 959 F.3d at 616 (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S 506, 510–14 (2002)); *see also Niner v. Garrett Cnty. Pub. Works*, No. ELH-17-2948, 2018 WL 3869748, at *16 (D. Md. Aug. 15, 2018) (noting "the elements of a prima facie case are a helpful guide in assessing the adequacy of the allegations").

### 1. Adverse employment action

BPD argues Handley does not allege he suffered any adverse employment action. "To prevail on a Title VII claim, 'the existence of some adverse employment action is required.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). The requirement is rooted in the statute's focus on discrimination "with respect to [] compensation, terms, conditions, or privileges of employment[.]" 42 U.S.C. § 2000e-2(a)(1). Reflecting this focus, courts have defined an adverse employment action as "a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (quoting *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018) (quoting *Holland*, 487 F.3d at 219) (internal quotation marks omitted). Examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

In Count I, Handley alleges De Sousa demoted him from his position as Acting Inspector, the equivalent of Lieutenant Colonel, and reassigned him to a less desirable location in the Southwest District. He alternatively describes his demotion as a failure to promote or honor his promotion. The Court refers to Handley's loss of his acting position as his "demotion" and treats

the demotion and his reassignment to the Southwest District as separate actions.  In Count II, Handley alleges De Sousa and/or his leadership team opened an Internal Affairs investigation against him based on fabricated hiring violations and refused to clear the charges despite a recommendation that they be "Not Sustained."  In Count III, Handley alleges BPD reassigned him to a less desirable work location in the Medical Section.

Handley's demotion constitutes an adverse employment action.  Handley alleges he held the rank of Major before his promotion to Acting Inspector.  He alleges that Inspector, under the old regime, was the equivalent of Lieutenant Colonel under the new regime—one rank above Major.  If De Sousa had maintained this promotion, Handley would have received a corresponding salary increase.  Other federal district courts have treated demotion from an acting position as an adverse employment action.  *Beauvais v. City of Inkster*, No. 16-CV-12814, 2017 WL 5192249, at *11 (E.D. Mich. Nov. 9, 2017) (denying summary judgment to employer on discrimination claim based the plaintiff's demotion from acting sergeant); *Lalau v. City & Cnty. of Honolulu*, 938 F. Supp. 2d 1000, 1014 (D. Haw. 2013) (treating demotion from acting supervisor position as an adverse employment action); *Wilk v. D.C.*, 730 F. Supp. 2d 20, 24 (D.D.C. 2010) ("There is no doubt that plaintiff's demotion [from an acting position] constitutes an adverse employment action.").[1]  While it is not clear whether the plaintiffs in these cases lost pay, benefits, responsibilities, or some combination, it does not matter because Handley alleges he lost rank and a corresponding salary increase.  Demotion in rank and the loss of salary touch directly on the

---

[1] In an unpublished opinion, the Fourth Circuit considered a discrimination claim based on demotion from an acting position, but it did not directly address whether or when such a demotion constitutes an adverse employment action.  *See Booth v. Md.*, 337 F. App'x 301, 304 (4th Cir. 2009) (unpublished per curiam) (granting summary judgment to employer on discrimination claim based on demotion from acting lieutenant position because the plaintiff could not establish causation).

terms and conditions of employment and are textbook examples of adverse employment actions. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (noting a materially adverse change might be indicated by, *inter alia*, "a demotion evidenced by a decrease in wage or salary" or "a less distinguished title").

BPD focuses on the "acting" nature of Handley's Inspector position, arguing that it was an inherently temporary title and Handley was never actually promoted.  To the extent BPD asserts Handley did not lose either rank or pay, such factual arguments are inappropriate at the motion to dismiss stage.  Handley alleges he was placed in an acting position, which increased his rank and future salary, and his subsequent removal from the acting position decreased his rank and salary. To the extent BPD takes issue with how Handley's allegations are framed, the argument is unpersuasive.  If Handley was promoted, he alleges demotion.  If he was never actually promoted, he alleges a failure to promote, and "[i]t has long been clear that failure to promote an employee constitutes an adverse employment action . . . ."  *Bryant*, 333 F.3d at 544 (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981)).  So long as Handley in fact lost rank and pay, as he alleges, then he suffered an adverse employment action however the action is framed.

Conversely, the Internal Affairs investigation alleged in Count II does not rise to the level of an adverse employment action.  Courts in this circuit often have rejected disparate treatment claims when the alleged adverse employment action was an investigation into employee conduct. *See, e.g.*, *Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 436–37 (D. Md. 2012) (holding "disciplinary investigations 'reasonably rooted in articulable facts justifying such an investigation' typically do not rise to the level of adverse employment actions") (quoting *Settle v. Balt. Cnty.*, 34 F. Supp. 2d 969, 992 (D. Md. 1999)); *Jenkins v. Balt. City Fire Dept.*, 862 F. Supp. 2d 427, 445–46 (D. Md. 2012) (granting summary judgment against plaintiff on disparate investigation claim),

*aff'd*, 519 F. App'x 192 (4th Cir. 2013) (unpublished per curiam); *Fulmore v. City of Greensboro*, 834 F. Supp. 2d 396, 417 (M.D.N.C. 2011) (holding investigation alone does not constitute an adverse employment action); *Dawson v. Rumsfeld*, No. 1:05-CV-1270 (JCC), 2006 WL 325867, at *6 (E.D. Va. Feb. 8, 2006) (reasoning from Fourth Circuit precedent that "the mere decision to initiate an investigation is not an adverse employment action" and citing cases); *Hoffman v. Balt. Police Dept.*, 379 F. Supp. 2d 778, 792–93 (D. Md. 2005) ("The few courts that have considered whether an investigation, *by itself*, can constitute an adverse employment action have answered that question in the negative.") (citing *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998)).  Essentially, an investigation that does not result in some adverse effect on the terms and conditions of employment is one of the "many interlocutory or mediate decisions having no immediate effect on employment conditions which were not intended to fall within the direct proscriptions of . . . Title VII." *Page*, 645 F.2d at 233.

Handley alleges De Sousa, in February 2018, ordered an Internal Affairs investigation into Handley's decision to hire Officer Doe despite a narcotics violation.  After an investigation in which Handley was interviewed and required to produce Daniel De Sousa's hiring file, the lead investigator formally recommended the charges be "Not Sustained," but De Sousa refused to sign off on the recommendation.  The investigation remained dormant and unresolved for two years, until the charges were finally closed as "Unfounded" in April 2020.  Critically, Handley does not allege the investigation resulted in any discipline or other adverse employment consequence.  He does not allege the investigation, despite its length, interfered with his pay, benefits, opportunities for promotion, or other terms and conditions of employment.  He retired in good standing. Handley's claim is analogous to those rejected in the cases cited above.

Finally, neither of Handley's reassignments constitute an adverse employment action.  It is true that "reassignment with significantly different responsibilities" may constitute an adverse employment action.  *Ellerth*, 524 U.S. at 761.  But "for a discrimination claim, the adverse action must result in 'some *significant detrimental effect*,' requiring more than a position that is 'less appealing' to the plaintiff."  *Laird v. Fairfax Cnty., Va.*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Holland*, 487 F.3d at 219) (emphasis in *Laird*).  For this reason, both the Fourth Circuit and this Court have rejected discrimination claims premised on reassignment where the employee suffered no "'decrease in compensation, job title, level of responsibility, or opportunity for promotion[.]'"  *Holland*, 487 F.3d at 219 (quoting *Boone*, 178 F.3d at 256–57); *see also, e.g.*, *James*, 368 F.3d at 374–77 (holding reassignment to another role without any change in job title, pay, benefits, or other terms and conditions of employment did not constitute adverse employment action); *Snyder v. Azar*, No. TDC-18-511, 2020 WL 4605223, at *6 (D. Md. Aug. 10, 2020) (holding temporary reassignment to a different office under a different supervisor was not an adverse employment action), *aff'd sub nom.*, *Snyder v. Becerra*, No. 20-2073, 2021 WL 5505403 (4th Cir. Nov. 24, 2021) (unpublished per curiam); *Hanning v. St. Joseph's Ministries, Inc.*, No. WDQ-14-3364, 2015 WL 9304538, at *7 n.20 (D. Md. Dec. 21, 2015) (holding reassignment that preserved the employee's position, schedule, responsibilities, salary, and benefits did not constitute an adverse employment action).

Handley does not allege his reassignment to the Southwest District resulted in any loss in pay, rank, benefits, responsibilities, or opportunities for promotion.  Although the reassignment occurred at the same time as Handley's demotion, they are separate actions.  According to the complaint, Handley's loss of salary resulted from the demotion, not the reassignment.  Handley alleges "he would have been a Lt. Colonel and receiving a salary corresponding *to that position*,"

referring to the acting position.  ECF 12, ¶ 35 (emphasis added).  He does not allege officers in the Southwest District are paid less than those in the Recruitment Unit.  And while Handley's responsibilities may have changed, they did not diminish or become any less significant.  Handley alleges he held command at the Recruitment Unit and was District Commander in the Southwest District.  De Sousa viewed the Southwest District as vital to crime reduction and reassigned Handley to mentor the district's Captain.  Even making all reasonable inferences in Handley's favor, the Court cannot plausibly infer from the allegations that the reassignment, separate and apart from the demotion, caused Handley to suffer significant detrimental effects.  Dismissal of the disparate reassignment claim is warranted.  *See Fulmore*, 834 F. Supp. 2d at 418 (dismissing disparate reassignment claim where the plaintiff officer alleged reassignment to a "lesser" patrol position but failed to allege facts indicating a "significant detrimental effect").

Likewise, Handley does not allege his reassignment to the Medical Section had any effect on the terms or conditions of his employment.  He describes the Medical Section as a less desirable assignment than the Southwest District, but desirability is not the standard.  He does not explain the nature of his work there, and he does not allege that the reassignment resulted in reduced salary, benefits, responsibilities, or opportunities for promotion.

The motion to dismiss is granted as to Handley's disparate treatment claims premised on his reassignments and the Internal Affairs investigation.  Counts II, III, and the disparate reassignment claim in Count I are dismissed.

### 2.  Inference of unlawful discrimination

BPD argues Handley has not alleged that his demotion, the only alleged adverse employment action, was motivated by his race or sex.  Handley responds that he alleges both direct evidence of discrimination and circumstances supporting an inference of discrimination.

"Direct evidence is evidence from which no inference is required."  *Holley v. N.C. Dept. of Admin., N.C.*, 846 F. Supp. 2d 416, 427 (E.D.N.C. 2012); *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020) ("Direct evidence[,] . . . if believed, proves the existence of a fact without inference or presumption.").  It "encompasses 'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested employment decision.'"  *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks omitted)).  Statements bear directly on employment decisions when they clearly connect a protected trait to the reason the employer acted.  *Warch*, 435 F.3d at 520 ("Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action.").

As direct evidence of discrimination, Handley points to De Sousa's statements at the February 26, 2018, Commissioner's Call to Accountability Retreat.  There, De Sousa allegedly stated, "BPD suffers from PMS – Pale, Male, Stale," and he declared his goal was the removal of "PMS elements" from the Department.  De Sousa's crude statements plainly indicate he wanted to make personnel decisions based on race and sex.  But when he made the statements about his personnel goals, he had already demoted Handley, and he did not say Handley's demotion one month earlier was because of his race and sex.  Moreover, even though De Sousa demoted Handley, Handley remained with the BPD in command level positions until his retirement over two years later—Handley was not "removed" from the Department.  Indeed, at the time of Handley's demotion, De Sousa transferred him to a district De Sousa described as critical to crime reduction so Handley could mentor that district's Captain.  Ultimately, De Sousa's statements do not bear directly on Handley's demotion because several inferences are necessary to connect them.

Handley's allegations nonetheless plausibly suggest that his race and/or sex motivated his demotion.  Although De Sousa's statements about removing "PMS elements" from the BPD may not be direct evidence of discrimination, they suggest De Sousa was considering the racial and gender makeup of the BPD around the time he demoted Handley.  Beyond this, Handley alleges De Sousa ordered the computers of Handley and several other Caucasian male officers seized immediately after De Sousa took over the helm.  The seizures were accompanied by a temporary loss of access to various systems.  Further, De Sousa obfuscated and changed his justification for these actions.  This occurred less than two weeks before Handley's demotion.  Together, De Sousa's statements about removing pale and male elements from the Department and his suspicious orders targeting Caucasian men support an inference of discrimination.[2]

BPD argues that Handley's disparate treatment claim should fail at the pleadings stage because Handley has alleged a specific non-discriminatory motive for De Sousa's conduct: Handley's refusal to hire his son, Daniel De Sousa.  It is true that in some circumstances, a

---

[2] Handley also identifies several potential comparators—African American and/or female officers who were promoted around the time of Handley's demotion.  A plaintiff is not required to allege the existence of comparators, but when a plaintiff's claims are based on comparisons to other employees, the plaintiff must allege the comparators were treated better "under arguably similar circumstances[.]"  *Woods v. City of Greensboro*, 855 F.3d 639, 650 (4th Cir. 2017); *see also Whitehurst v. Bedford Cnty. Sch. Bd.*, No. 6:19-CV-10 (NKM), 2020 WL 535962, at *6–7 (W.D. Va. Feb. 3, 2020) (discussing the similarly situated requirement at the motion to dismiss stage and citing cases); *McCleary-Evans*, 780 F.3d at 586 (affirming dismissal where the plaintiff could "only speculate that the persons hired were not better qualified, or did not perform better during their interviews, or were not better suited based on experience and personality for the positions").  While the plaintiff must "adequately plead that [his] comparators were both similarly situated and engaged in similar conduct without facing the same adverse employment actions[,]" details such as "duties, responsibilities, hours, and reporting structure" are helpful but unnecessary at the motion to dismiss stage.  *Whitehurst*, 2020 WL 535962, at *7 (citing *Woods*, 855 F.3d at 650–51).  Of the potential comparators Handley identifies, only one shared Handley's rank: Acting Inspector Byron Conaway, who was promoted to Colonel when Handley was demoted to Major.  Handley does not allege any other information about Conaway.  The Court need not decide whether Handley's identification of Conaway alone would support a reasonable inference of discrimination because Handley's other allegations are sufficient to survive a motion to dismiss.

plaintiff's allegations of a specific non-discriminatory motive may create grounds for dismissal of a disparate treatment claim. *See Bing*, 959 F.3d at 617 (dismissing claim where the plaintiff "specifically alleged a non-racial reason for [his] termination"). However, it appears that the plaintiff in *Bing* did not allege any facts supporting an inference of discrimination and only alleged a non-discriminatory motive. The Court's holding would not make sense otherwise, since Title VII's anti-discrimination provisions require that the employee's protected trait be only "a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *see also Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) ("When it comes to Title VII, . . . a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision."). So, even if De Sousa was motivated in part by Handley's rejection of his son's application, as long Handley's race or sex also was a motivating factor, Handley has a viable disparate treatment claim.

Ultimately, Handley has alleged facts plausibly supporting his claim that his demotion was motivated by his race and/or sex. BPD's motion to dismiss is denied as to the disparate demotion claim in Count I.

### B. Retaliation

Handley claims BPD retaliated against him after he filed his initial charge of discrimination (Count IV), and again after he filed this lawsuit (Count V). The *McDonnell Douglas* framework also applies to Title VII retaliation claims where, as here, there is no direct evidence of retaliation. *Laird.*, 978 F.3d at 892–93. Under the *McDonnell Douglas* framework, a *prima facie* claim of retaliation consists of three elements: (1) engagement in a protected activity, (2) an adverse action, and (3) a causal link between the two events. *Roberts*, 998 F.3d at 122 (citing *Foster*, 787 F.3d at 250)); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015) (quoting *Boyer-Liberto v.*

*Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc)) (internal quotation marks omitted); *see also Laird*, 978 F.3d at 893 (clarifying the second element is an "adverse action," not an "adverse employment action"). As with disparate treatment, "at the motion to dismiss stage a plaintiff need not establish a prima facie claim of retaliation. Rather, the plaintiff merely 'must allege[] facts that plausibly state a violation of Title VII above a speculative level.'" *Prosa v. Austin*, No. ELH-20-3015, 2022 WL 394465, at *34 (D. Md. Feb. 8, 2022) (quoting *Bing*, 959 F.3d at 617 (quoting *Coleman*, 626 F.3d at 190)).

BPD argues that both of Handley's retaliation claims must be dismissed because he has not alleged any adverse action.[3] The adverse action element of retaliation claims is distinct from the similar adverse employment action element of disparate treatment claims. The Supreme Court has clarified that "the antiretaliation provision [in Title VII] extends beyond workplace-related or employment related retaliatory acts and harm" because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

> Accordingly, retaliatory actions need not 'affect the terms and conditions of employment' to come within Title VII's prohibition. However, retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity.

*Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018) (quoting *Burlington*, 548 U.S. at 63–64, 68). Thus, while the realm of adverse actions for Title VII retaliation claims is broader

---

[3] BPD also argues Handley has not exhausted the retaliation claim in Count IV. Claims brought under Title VII are subject to an administrative exhaustion requirement. *Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1850–51 (2019); *Chacko v. Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C. § 2000e-5(e)(1)). "An individual cannot bring suit until he has exhausted the administrative process." *Chacko*, 429 F.3d at 509 (citing 42 U.S.C. § 2000e-5(b), (f)(1)). Exhaustion is not jurisdictional, *Fort Bend Cnty., Tex.*, 139 S. Ct. at 1850–51, however, and the Court therefore need not reach the exhaustion question if Handley has not stated a claim for retaliation. As discussed below, he has not.

than for disparate treatment claims, it is not limitless, and "normally petty slights, minor annoyances, and simple lack of good manners" will not qualify. *Burlington*, 548 U.S. at 68. There still must be "some direct or indirect impact on an individual's employment as opposed to harm immaterially related to it." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015). This is so because Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67.

In short, "although the *scope* of actions that qualify as an adverse action may differ" between disparate treatment and retaliation claims, "both claims share a 'common element': an *adverse* action, meaning some action that results in some 'significant detriment' to the employee." *Laird*, 978 F.3d at 893 (quoting *Adams*, 789 F.3d at 431). Consistent with the above guidance, this Court has previously ruled that

> [e]ven with this lower bar, none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'

*Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (internal citations omitted).[4]

Neither of Handley's retaliation claims include any allegations that he suffered an adverse action. In Count IV, Handley alleges he was berated by Barillaro and removed from a GroupMe group text for BPD command members. "[O]ccasional yelling from a boss does not rise to the level of a materially adverse employment action." *Adams v. Upper Chesapeake Med. Ctr., Inc.*,

---

[4] In an unpublished opinion, the Fourth Circuit subsequently held that a letter of warning from the employee's supervisor did qualify as an adverse action because such a letter warned that "future disciplinary actions could result in further discipline, including termination." *Barnes v. Charles Cnty. Pub. Sch.*, 747 F. App'x 115, 119 (4th Cir. 2018) (unpublished per curiam).

No. AMD-08-346, 2009 WL 997103, at *4 (D. Md. Apr. 14, 2009) (citing *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 243 (4th Cir. 1997)).  An isolated incident, as alleged here, certainly does not do so.  Likewise, Handley's removal from the GroupMe group text, which he does not allege resulted in any injury or harm, is exactly the kind of petty slight and minor annoyance that courts have routinely held fall outside the scope of Title VII.  Such a superficial and petty action would not dissuade a reasonable worker from engaging in protected activity.  *See Staggers v. Becerra*, No. ELH-21-231, 2021 WL 5989212, at *23 (D. Md. Dec. 17, 2021) (dismissing retaliation claim based on "berating" by the plaintiff's supervisor, referral to an Employee Assistance Program, and a requirement that the plaintiff provide status reports five times each day because those allegations represented only "petty slights or minor annoyances" and not any meaningful injury or harm).

The alleged adverse action in Count V comes closer to the mark but still falls short.  Handley alleges that, on his last day before retirement, BPD's Public Integrity Bureau instructed him to prepare a written statement, admit guilt, and accept an unspecified punishment regarding the allegation that Handley used a racial slur during a phone call with Carter, a job applicant.  Handley wrote a statement but refused to admit guilt or accept any punishment.  While he alleges Nadeau, deputy chief of the Public Integrity Bureau, verbally threatened his ability to retire in good standing due to the unresolved complaint, he also alleges that he previously had received documentation from the Public Integrity Bureau that no unresolved matters prohibited him from retiring in good standing.  He does not allege BPD took any further actions regarding Carter's allegation.  To the contrary, after Nadeau learned of the good standing letter, he stated Handley was "good with that letter," thanked him for his commitment to BPD, and wished him the best.  Even if a written warning of specific future discipline may in some instances constitute an adverse action, *see Barnes*, 747 F. App'x at 119 (citing *Billings v. Town of Grafton*, 515 F.3d 39, 54–55

(1st Cir. 2008)), that is not what Handley alleges took place.  Nadeau's warning was verbal, undermined by the good standing letter, and almost immediately rescinded.  Neither the warning nor any other action alleged in support of Count V resulted in any detriment to Handley.

Counts IV and V are dismissed.

## IV.   Conclusion

Handley does not plausibly allege Title VII violations in Counts II, III, IV, or V.  Those claims are dismissed.  As for Count I, the motion to dismiss is granted as to the reassignment claim and denied as to the demotion claim.

DATED this 26th day of August, 2022.

Deborah L. Boardman
United States District Judge